IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:20-CV-536-FL

| | | |
|---|---|---|
| BECTON, DICKINSON AND COMPANY, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | ORDER |
| BIOMEDOMICS, INC., | ) ) ) | |
| Defendant. | ) | |

This matter is before the court on plaintiff's motion for judgment on the pleadings (DE 20) as to defendant's counterclaim.[1] The motion has been briefed fully, and the issues raised are ripe for ruling. For the following reasons, the motion is granted in part and denied in part.

## STATEMENT OF THE CASE

Plaintiff commenced this action on October 8, 2020, asserting claims for breach of contract and unjust enrichment arising out of the manufacture and sale by defendant of a product for testing COVID-19 infection (the "Product"). Plaintiff seeks damages in the amount of $6,125,000.00, in addition to lost profits, interest, and attorneys' fees. Alternatively, plaintiff seeks a judgment requiring disgorgement, equitable lien, and/or constructive trust.

Defendant filed an answer and a counterclaim, on December 8, 2020, asserting breach of contract and promissory estoppel based upon plaintiff's refusal to pay for and take delivery of the

---

[1] Also pending, but not yet ripe, are defendant's motions to compel (DE 32, 40) and plaintiff's motion to compel (DE 36) discovery responses, which motions will be addressed by separate order.

Product. Defendant seeks damages in excess of $75,000.00 in an amount to be proven at trial, interest, costs and attorneys' fees. Plaintiff filed a response to the answer on January 12, 2021.

The court entered a case management order on January 21, 2021, setting a September 20, 2021, deadline for discovery, and a February 25, 2021, deadline for filing motions for leave to amend the pleadings.

Plaintiff filed the instant motion for judgment on the pleadings on February 3, 2021. Defendant responded in opposition on February 24, 2021, and plaintiff replied on March 10, 2021.[2]

## STATEMENT OF THE FACTS

The facts alleged in the pleadings, construed in the light most favorable to defendant, may be summarized as follows.

Plaintiff is a New Jersey corporation with its principal place of business in Franklin Lakes, New Jersey. Defendant is a North Carolina corporation with its principle place of business in Morrisville, North Carolina. Plaintiff is a "global medical technology company that is advancing the world of health by improving medical discovery, diagnostics and the delivery of care." (Compl. ¶ 3).[3]

"In December 2019, a novel (new) coronavirus known as SARS-CoV-2 ('COVID-19') was first detected in Wuhan, Hubei Province, People's Republic of China." (Counterclaim ¶ 4). "Since its detection, COVID-19 has infected many individuals around the globe. On or about March 11, 2020, the World Health Organization determined COVID-19 spurred a global pandemic." (Id. ¶ 5). "Knowledge of prior infection is epidemiologically important and represents a significant unmet need in the management of the COVID-19 pandemic." (Id. ¶ 6).

---

[2] The court received notice of a discovery dispute on May 20, 2021, and the court entered a text order on May 25, 2021, directing the parties to file motions to compel by June 8, 2021, which the parties now have done.

[3] Unless otherwise specified, any cited allegation of the complaint is admitted in the answer.

"To address this significant unmet need in the United States and around the world, [defendant] developed and launched its IgM/IgG assay (the 'Product') able to detect COVID-19 antibodies for a prolonged period of time after disease resolution, enabling identification of prior infection." (Id. ¶ 7). "Recognizing the importance of tracing the spread of COVID-19, the United States Food and Drug Administration ('FDA') issued policy guidance on or about March 16, 2020 that it would not object to production and distribution of tests designed to detect COVID-19 provided certain conditions were met." (Id. ¶ 8).

"Specifically, under the March 16, 2020 guidelines, the FDA permitted the manufacture, distribution, and use of serology tests without Emergency Use Authorization ('EUA') if the tests had been self-validated; notice was given to consumers that FDA had not reviewed the tests and test results should not be used as a sole basis for diagnosing or excluding COVID-19; and an EUA request was submitted to the FDA within 15 business days." (Id. ¶ 9). "An EUA is issued by the FDA during a public health emergency to allow for the use of unapproved medical products, or unapproved uses of approved medical products, to diagnose, treat, or prevent serious or life-threatening diseases when certain criteria are met, including that there are no adequate, approved, and available alternatives." (Compl. ¶ 18).

"From March 16, 2020 to March 26, 2020, [plaintiff] reached out to [defendant] to investigate whether it wanted to purchase the Product. This included inspection of [defendant's] and its affiliate's facilities, receiving from [defendant] Product specification information, and reviewing samples of the Product for evaluation." (Counterclaim ¶ 10).

"Ultimately, the parties signed a nonbinding Term Sheet on March 26, 2020, calling for a definitive distribution agreement (the 'Term Sheet')." (Id. ¶ 11). In accordance with the Term Sheet, defendant was required to manufacture and sell to plaintiff a "serology test which is

3

Case 5:20-cv-00536-FL   Document 43   Filed 06/15/21   Page 3 of 20

represented by [defendant] to detect the presence of antibodies in the blood when the body is responding to an infection." (Compl. ¶ 9).[4] "The Term Sheet only covered units of the Product intended for sale in the United States." (Counterclaim ¶ 11). "However, the parties also contemplated that BD and BioMedomics would negotiate in good faith distribution of the Product in other areas of the world once they established a course of dealing." (Id.).

As part of its performance in accordance with the terms of the Term Sheet, on March 29, 2020, [plaintiff] submitted an initial purchase order for 1,000,000 units of the Product along with prepayment in the amount of $4,000,000.00." (Compl. ¶ 14). "On April 2, 2020 at 2:30 p.m., [defendant's] Chief Executive Officer met with [plaintiff's] representatives via conference call." (Counterclaim ¶ 12). "During that meeting, [plaintiff] requested increased production of the Product, distribution rights to other countries, and that all April and May units of the Product be shipped to [plaintiff]." (Id.). "On April 9, 2020, [defendant] began fulfilling the initial purchase order by delivering 50,000 units of the Product to [plaintiff]." (Compl. ¶ 14). "On April 23, 2020, [plaintiff] received another 50,000 units of the Product from [defendant], pursuant to the purchase orders." (Id.).

"Several weeks later, on April 28, 2020 the parties' representatives met again to discuss production." (Conterclaim ¶ 13). "[Plaintiff] indicated that it wanted 1,500,000 units of the Product for distribution in the United States and 1,000,000 units of the Product for distribution outside the United States in June." (Id.). Plaintiff "represented it would order 2,000,000 units of the Product for distribution in the United States and 1,500,000 units of the Product for distribution outside the United States for each month beginning with July." (Id.). Defendant "agreed to these

---

[4] The term sheet is not in the record, and defendant only admits allegations about the term sheet insofar as the "referenced document speaks for itself as a matter of fact and law." (Ans. ¶¶ 10-13).

production requests." (Id.). "Shortly thereafter, the parties' representatives discussed selling the Product for distribution outside the United States to [plaintiff] at $6.50 per unit of the Product." (Id. ¶ 14).

On May 4, 2020, the FDA issued a notice, which "modified its guidance, requiring higher performance sensitivity for serology tests." (Id. ¶ 15). The notice concerned a requirement for obtaining an EUA. (Compl. ¶ 17).[5] "The Product did not meet this new requirement." (Counterclaim ¶ 15). "Following this change in regulatory policy, [the parties] discussed and agreed to withdraw the EUA application for [a] first generation of the Product and submit an EUA application for [a] second generation of the Product." (Id. ¶ 16).

"[Defendant] internally tested the second generation the Product and determined that it met the FDA's new requirements for an EUA." (Id. ¶ 17). "[Plaintiff] completed its own review of the Product and also was satisfied that the second generation of the Product met the FDA's requirements." (Id.). "In the meantime, [defendant] prepared to manufacture and ship [plaintiff's] purchased units of the Product." (Id. ¶ 18).

"On May 26, 2020, the parties' representatives discussed shipment of the Product to [plaintiff]." (Id. ¶ 19). "In addition to the quantities to be shipped to the United States, [plaintiff] again requested that [defendant] procure 1,000,000 units of second generation units of the Product for [plaintiff] to distribute outside the United States in June." (Id.).

In accordance with "requests and statements by [plaintiff's] authorized representatives, during late May 2020 [plaintiff's] management team asked [defendant] to produce and ship tests to [plaintiff] so that [plaintiff] would be more likely to meet its second quarter financial goals (i.e., reports compiled as of the end of June 2020)." (Id. ¶ 20). "At the time of these requests and

---

[5] The FDA notice is not in the record, and defendant only admits allegations about the FDA notice insofar as the "referenced document speaks for itself as a matter of fact and law." (Ans. ¶ 17).

statements, [plaintiff] knew that [defendant] did not have an EUA but accepted the risk that [defendant] would not obtain approval in hope that [plaintiff] could meet its performance goals." (Id.).

"[Plaintiff] also requested [defendant] provide 1,500,000 units of second generation units of the Product per month from July to September for distribution outside of the United States." (Id. ¶ 21). "[Plaintiff] represented to [defendant] that [plaintiff] would issue purchase orders for these units of the Product." (Id. ¶ 22). "[Plaintiff's] purchase orders are subject to standard terms and conditions, including that its contracts are governed by New Jersey law." (Id. ¶ 23). "The parties intended these standard terms and conditions to apply to purchases of the Product for distribution outside the United States." (Id.).

"In response to [plaintiff's] requests, [defendant] confirmed to [plaintiff] that [defendant] agreed to produce the requested amount of the Product for [plaintiff]." (Id. ¶ 24). "[Plaintiff's] Trade Compliance Specialist provided [defendant] information for delivery of the Product in Europe on or about May 27, 2020." (Id. ¶ 25). "[Plaintiff] also reached out to [defendant] to set a shipment schedule for the units of the Product to the United States and outside the United States." (Id. ¶ 26).

"Thereafter, on May 27, 2020, [defendant] submitted an EUA application to the FDA for the Product." (Compl. ¶ 19). "On May 29, 2020, the parties discussed transportation and materials costs for the Product, and discussed a $6.50 per unit of the Product price for the Product distributed outside the United States." (Counterclaim ¶ 28). On May 31, 2020, plaintiff "followed up with [defendant] . . . on setting a shipment schedule." (Id. ¶ 26). "[Defendant] responded to [plaintiff's] inquiry, agreeing to send 1,000,000 units of Product to [plaintiff] in Europe by mid-July, with an additional weekly deliveries of the Product beginning thereafter for both the United States and

outside the United States markets." (Id. ¶ 27). "Because [the parties] were both merchants trading in pharmaceutical products, and due to the significant, immediate demand for the Product created by the COVID-19 pandemic, the Parties agreed upon sale of the Product with the price left to be determined by the Parties upon issuance of a purchase order." (Id. ¶ 28). "One week later, [plaintiff] requested that [defendant] ship the Product for distribution outside the United States to the European Union." (Id.).

"In accordance with its agreements with [plaintiff], from April 28, 2020, to July 10, 2020, [defendant] procured a total of 2,500,000 units of the Product for distribution by [plaintiff] outside the United States." (Id. ¶ 29).

In the meantime, "[o]n June 11, 2020, [defendant] issued a medical device recall for the Product pursuant to the FDA's May 4, 2020 notice, requesting that all remaining units of the product be returned or destroyed." (Compl. ¶ 20). "On July 28, 2020, the FDA issued a notice to [defendant] stating that the Product did not satisfy the requirements for EUA." (Id. ¶ 22). Plaintiff "actively cooperated with [defendant] in its efforts to secure the EUA." (Id. ¶ 23). "However, as of the date of [the complaint], [defendant] has not obtained the required EUA for the sale and distribution of the Product from the FDA." (Id. ¶ 24).

Plaintiff "sent a notice on August 14, 2020, stating that it did not intent to continue its relationship with [defendant] and demanded a full repayment of its prepayment for the Product." (Id. ¶ 25). In the notice, plaintiff "repudiat[ed] [plaintiff's] agreements with [defendant]." (Counterclaim ¶ 31). The notice, "which purported to terminate the parties' relationship, was grounded solely upon the absence of an EUA for distribution of the Product in the United States." (Id.). "However, [plaintiff] did not offer any reason that the Product to be distributed outside the United States could not be sold or distributed." (Id.). "Because of [plaintiff's] expansive monthly

7

requirements for delivery of the Product, [defendant] bought significant amounts of production materials to supply the Product to satisfy [plaintiff's] requirements."  (Id. ¶ 32).

"By letter dated September 4, 2020, [defendant] refused to refund [plaintiff's] prepayment for the Product and has thereafter continued such refusal."  (Compl. ¶ 26).  "At no point did [plaintiff] pay for the Product purchased for distribution outside the United States." (Counterclaim ¶ 30).

## COURT'S DISCUSSION

A.Standard of Review

"A Rule 12(c) motion tests only the sufficiency of the [counterclaim] and does not resolve . . . any disputes of fact." Drager v. PLIVA USA, Inc., 741 F.3d 470, 474 (4th Cir. 2014). The court applies "the same standard for Rule 12(c) motions as for motions made pursuant to Rule 12(b)(6)." Burbach Broad. Co. of Delaware v. Elkins Radio Corp., 278 F.3d 401, 406 (4th Cir. 2002).  Thus, the court must "assume the facts alleged in the [counterclaim] are true and draw all reasonable factual inferences in [the defendant's] favor." Id.

A pleading "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "Factual allegations must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555. In evaluating whether a claim is stated, the court does not consider "legal conclusions, elements of a cause of action, . . . bare assertions devoid of further factual enhancement[,] . . . unwarranted inferences, unreasonable conclusions, or arguments." Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 255 (4th Cir. 2009) (quotations omitted).

8

B. Analysis

1. Breach of Contract

"Under New Jersey law,[6] 'an enforceable agreement requires mutual assent, a meeting of the minds based on a common understanding of the contract terms.'" Aliments Krispy Kernels, Inc. v. Nichols Farms, 851 F.3d 283, 290 (3d Cir. 2017) (quoting Morgan v. Sanford Brown Inst., 137 A.3d 1168, 1180 (2016)). "In addition to mutual assent, the New Jersey Uniform Commercial Code ['UCC'] requires that 'a contract for the sale of goods for the price of $500 or more' be set forth in writing and 'signed by the party against whom enforcement is sought or by his authorized agent or broker.'" Id. (quoting N.J. Stat. Ann. § 12A:2-201(1)). "[W]here the defect of [this] statute of frauds appears on the face of the pleading, the question may be raised on motion to dismiss for insufficiency." ALA, Inc. v. CCAIR, Inc., 29 F.3d 855, 859 (3d Cir. 1994) (quotations omitted).

Defendant asserts in its counterclaim that plaintiff breached a contract by refusing to pay defendant for 2,500,000 units of the Product for plaintiff to distribute outside the United States (the "Export Product"), by repudiating its relationship with defendant, and by wrongfully refusing to take delivery of the Export Product. (Counterclaim ¶¶ 39-40). Defendant does not, however, allege a contract for the sale of the Export Product set forth in writing and signed by plaintiff. (Id. ¶¶ 33-41). Therefore plaintiff seeks dismissal of the breach of contract counterclaim on the basis of the UCC statute of frauds.

---

[6] The parties agree that North Carolina choice of law rules determine the law applicable to defendant's counterclaim. Under these rules, defendant contends that New Jersey law applies. Plaintiff contends that North Carolina law applies, but plaintiff asserts that dismissal is warranted under either North Carolina law or New Jersey law (Pl's Mem. (DE 22) at 14). For purposes of the instant analysis, viewing the allegations in the pleadings in the light most favorable to defendant, the court applies the law of New Jersey, as the state with the "most significant relationship" to the transactions, Boudreau v. Baughman, 322 N.C. 331, 338 (1988), particularly where plaintiff is based in New Jersey, plaintiff has asserted claims based upon purchase orders allegedly requiring application of New Jersey law, and where defendant asserts its counterclaim arising out of that prior course of dealing. (See, e.g., Counterclaim ¶ 23).

9

In opposition to dismissal, defendant contends that two exceptions to the UCC statute of frauds apply such that it has stated a viable claim for breach of contract. The court addresses these exceptions in turn below.

a. Merchants Exception

One exception to the UCC statute of frauds is "[b]etween merchants if [1] within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received and [2] the party receiving it has reason to know its contents," and [3] the receiving party does not give "objection to its contents . . . within ten days after it is received." N.J. Stat. § 12A:2-201(2). If the requirements of this exception are met, "under New Jersey law, a lack of a signature in an agreement between two merchants is simply not dispositive." Aliments Krispy Kernels, Inc., 851 F.3d at 291.

Here, defendant has not alleged sufficient facts permitting an inference of "a writing in confirmation" element of the merchants exception. N.J. Stat. § 12A:2-201(2). Defendant claims that plaintiff offered to purchase 1,000,000 units of Export Product for June, and 1,500,000 units per month starting in July, and that defendant accepted this offer and procured a total of 2,500,000 units for plaintiff. (Counterclaim ¶¶ 36, 39). Defendant points to allegations in paragraphs 13, 19, 21, and 24 of the counterclaim as factual support for a "writing in confirmation" of a contract with these terms. None of these paragraphs, however, allege any writing. Rather, they allege, variously, discussions, requests, representations, confirmations, and agreements. (Id. ¶¶ 13, 19, 21, 24).

Accordingly, critically lacking is any allegation of a <u>writing</u> confirming a contract with the claimed terms. Defendant argues that the court should infer a writing because the counterclaim "does not specify whether its discussions with [plaintiff] regarding specific quantities of Export Product were oral or in writing." (Def's Mem. (DE 24) at 16). It is incumbent upon defendant,

however, to allege sufficient factual matter to state a plausible claim for relief. Twombly, 550 U.S. at 570. Here, it is merely "conceivable" that there was a writing, id., but it is not plausible, particularly given the allegations limited to "discuss[ions]" and "request[s]." (Counterclaim ¶¶ 12-14, 19-21). If there is a writing confirming a contract with the claimed terms, then defendant must allege it.

In sum, there are insufficient facts alleged to state a counterclaim on the basis of the merchants exception to the statute of frauds.

        b.        Specially Manufactured Goods

Another exception to the UCC statute of frauds is for a contract where "[1] the goods are to be specially manufactured for the buyer and [2] are not suitable for sale to others in the ordinary course of the seller's business and [3] the seller, before notice of repudiation is received and under circumstances which reasonably indicate that the goods are for the buyer, has made either a substantial beginning of their manufacture or commitments for their procurement." N.J. Stat. § 12A:2-201(3)(a).

Here, defendant has not stated a claim for breach of contract under this exception. In particular, defendant fails to allege facts permitting an inference that the Export Product was "not suitable for the sale to others in the ordinary course of business." Id. Defendant suggests the opposite, where it alleges that it "developed and launched" the Product "[t]o address [a] significant unmet need in the United States and around the world," and that plaintiff requested the product after it was developed. (Counterclaim ¶ 7, 10, 19, 21). Moreover, the Product is not alleged to be a component or part of another product sold only by plaintiff. Rather, plaintiff's role, as described in the pleadings, is one of a distributor or a marketer of the Product. (See, e.g., id. ¶¶ 25-29, 31).

As such, there is no basis upon which to infer that the Product was not suitable for sale to others in the ordinary course of defendant's business.

Cases cited by defendant for comparison to the instant case are instructively distinguishable. In Smith v. Onyx Oil & Chem. Co., 218 F.2d 104, 109 (3d Cir. 1955), for example, the court applied a similarly-worded exception to the statute of frauds,[7] in circumstances where a defendant product manufacturer worked with the plaintiff distributor of dry cleaning supplies and equipment to develop a new product that the plaintiff could market and sell. See id. at 107; see also Smith v. Onyx Oil & Chem. Co., 120 F. Supp. 674, 675 (D. Del. 1954).[8] In contrast to the allegations in the instant case, the plaintiff in Smith had observed and overseen a preliminary demonstration by defendant of use of two chemicals that could be distributed to dry cleaners. 120 F.Supp. at 676. After that preliminary demonstration, the plaintiff "requested [the defendant] to try to combine the two products into one so as to have a saleable product." Id. The defendant then "promised [the plaintiff] they would go back to their plant and 'attempt to combine them (the two products) into a marketable product." Id. The defendant then presented a new combined product to the plaintiff, and representatives from both parties agreed on a trade name for the new product, which name would be the property of the plaintiff. Id. The plaintiff then insisted upon an "exclusive right to sell the new product." Id. The plaintiff went forward with promoting the new product, including "taking orders and incurring advertising expenses" for it. Id. at 680.

---

[7] The court in Smith, applied a New York statutory provision that created "an exception to [its] requirement for a writing where the subject matter of the contract is to be 'manufactured by the seller especially for the buyer and (is) not suitable for sale to others in the ordinary course of the seller's business.'" 218 F.2d at 109 (quoting N.Y. Personal Prop. Law, McK. Consol. Laws. c. 41 § 85).

[8] The court of appeals in Smith cited approvingly to the thorough recitation of facts by the district court, see 218 F.2d at 107, which facts, also referenced in the text above, provide a much clearer image of the circumstances than the summary in the court of appeals decision.

Smith is distinguishable in several key respects. As an initial matter, the role of the parties was reversed from the instant case. The plaintiff seeking to enforce the unexecuted contract in Smith had made arrangements to sell a product that he had advertised and planned to source exclusively from the defendant. In addition, the product at issue in Smith was developed at the request of the plaintiff, and based upon suggestions from the plaintiff, after an initial demonstration, as to how ingredients could be combined by defendant. In the instant case, by contrast, there are no equivalent allegations that the parties had worked in this manner to develop a mixture of ingredients or components for the Product, with input from one another, to render it marketable. Thus, the facts alleged in the instant case are insufficient to bring it within the exception as interpreted in Smith.[9]

In Impossible Elec. Techniques, Inc. v. Wackenhut Protective Sys., Inc., 669 F.2d 1026, 1036 (5th Cir. 1982), the court of appeals held there was a genuine issue of material fact as to application of this exception, where a plaintiff manufacturer had "custom-made" security cameras for use at a personal residence of the defendant buyer. In addition, the court cited evidence that the plaintiff manufacturer "could not resell the cameras because they had been specially adapted to adjust automatically to" the lighting conditions at the defendant's residence. Id. at 1037. There is no equivalent allegation here that defendant custom-made its Product for defendant, much less that defendant made the Product to fit particular conditions, settings, or circumstances experienced only by defendant. Rather, the Product was developed for a "need in the United States and around the world." (Counterclaim ¶ 7).

---

[9] Defendant references a "second generation of the Product" that it "internally tested," and upon which plaintiff also "completed its own review" to its satisfaction. (Counterclaim ¶ 17). There are insufficient factual allegations regarding this second generation product and its development to permit an inference that it was specially manufactured for defendant. Rather, defendant alleges that it tested the product to determine "that it met the FDA's new requirements for an EUA," and that defendant also "was satisfied that the second generation of the Product met the FDA's requirements." (Id.) (emphasis added).

13

Furthermore, it is notable that the court of appeals in <u>Impossible Electronic Techniques, Inc.</u> opined that "[t]he crucial inquiry is whether the manufacturer could sell the goods in the ordinary course of his business to someone other than the original buyer." 669 F.2d at 1037. "If with slight alterations the goods could be so sold, then they are not specially manufactured; if, however, essential changes are necessary to render the goods marketable by the seller to others, then the exception does apply." <u>Id.</u> There is no allegation or suggestion in the complaint here that defendant needed "essential changes" to sell the Product to others. Instead, according to the complaint, plaintiff "did not offer any reason that the Product to be distributed outside the United States could not be sold or distributed." (Counterclaim ¶ 31).

In sum, <u>Smith</u> and <u>Impossible Electronic Techniques</u> illustrate the shortcomings in the allegations of the instant complaint.[10] The facts alleged do not permit a plausible inference that the Product was specially manufactured for defendant. Therefore, defendant's breach of contract counterclaim must be dismissed. Where the deficiencies in the breach of contract claim conceivably could be cured by additional factual allegations, dismissal is without prejudice, and the court allows defendant a period of time within which to file a motion for leave to amend the counterclaim.

2. Promissory Estoppel

"Promissory estoppel is made up of four elements: (1) a clear and definite promise; (2) made with the expectation that the promisee will rely on it; (3) reasonable reliance; and (4) definite and substantial detriment." <u>Toll Bros. v. Bd. of Chosen Freeholders of Cty. of Burlington</u>, 194

---

[10] An additional case cited by defendant, <u>Webcor Packaging Corp. v. Autozone, Inc.</u>, 158 F.3d 354 (6th Cir. 1998), in which the court held that the specially manufactured goods exception did not apply, does not support application of the exception under the present circumstances. Indeed, the court emphasized that "the proponent must convince the court that the goods themselves have some feature that makes the product marketable only to the buyer," <u>id.</u> at 357, which is not a plausible inference from the instant allegations.

14

N.J. 223, 253 (2008). "A promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee, and which does induce such action or forbearance, is binding if injustice can be avoided only by enforcement of the promise." Friedman v. Tappan Dev. Corp., 22 N.J. 523, 538 (1956) (quoting Restatement, Contracts, section 90).

With respect to the first element, "a broad and vague implied promise" will not suffice to support a claim of promissory estoppel. C & K Petroleum Prod., Inc. v. Equibank, 839 F.2d 188, 192 (3d Cir. 1988). A "mere expression of future intention" does not "constitute a sufficiently definite promise" to support a promissory estoppel claim. In re Phillips Petroleum Sec. Litig., 881 F.2d 1236, 1250 (3d Cir. 1989). Likewise "a truthful statement as to the present intention of a party with regard to his future acts is not the foundation upon which an estoppel may be built. The intention is subject to change." Id. (quotations omitted); see Read v. Profeta, 397 F. Supp. 3d 597, 629–30 (D.N.J. 2019) (same).

Here, defendant alleges sufficient facts to state a claim for promissory estoppel. With respect to the first element, the following allegations, taken together, permit an inference of a clear and definite promise by plaintiff to purchase 1,000,000 units of the Product for distribution outside the United States in June, and 1,500,000 units for each month beginning in July.

1. "On May 26, 2020, . . . [plaintiff] requested that [defendant] procure 1,000,000 units of second generation units of the Product for [plaintiff] to distribute outside the United States in June." (Counterclaim ¶ 19).

2. "[D]uring late May 2020 [plaintiff's] management team asked [defendant] to produce and ship tests to [plaintiff] so that [plaintiff] would be more

15

likely to meet its second quarter financial goals (i.e., reports compiled as of the end of June 2020)." (Id. ¶ 20).

3. "[Plaintiff] also requested [defendant] provide 1,500,000 units of second generation units of the Product per month from July to September for distribution outside of the United States." (Id. ¶ 21).

4. "[Plaintiff] represented to [defendant] that [plaintiff] would issue purchase orders for these units of the Product." (Id. ¶ 22).

5. "In response to [plaintiff's] requests, [defendant] confirmed to [plaintiff] that [defendant] agreed to produce the requested amount of the Product for [plaintiff]." (Id. ¶ 24).

6. In late May, 2020, "due to the significant, immediate demand for the Product created by the COVID-19 pandemic, the Parties agreed upon sale of the Product with the price left to be determined by the Parties upon issuance of a purchase order." (Id. ¶ 28).

7. "One week [after May 28, 2020], [plaintiff] requested that [defendant] ship the Product for distribution outside the United States to the European Union." (Id.).

These same allegations, coupled with additional allegations regarding defendant's responses thereto, also satisfy the element that the promise to purchase was made with the expectation that defendant will rely upon it, and that defendant in fact reasonably relied upon it. (See, e.g., Counterclaim ¶ 13 (stating defendant "agreed to these production requests"); ¶ 18

16

(stating defendant "prepared to manufacture and ship [plaintiff's] purchased units of the Product"); ¶24; ¶ 26 (stating plaintiff "followed up with [defendant] . . . on setting a shipment schedule"); ¶ 27 (stating defendant "responded to [plaintiff's] inquiry, agreeing to send 1,000,000 units of Product to [plaintiff] in Europe by mid-July, with . . . additional weekly deliveries of the Product beginning thereafter for . . . outside the United States")). In addition, defendant took concrete steps to its definite and substantial detriment in furtherance of that reasonable reliance by "procur[ing] a total of 2,500,000 units of the Product for distribution by [plaintiff] outside the United States." (Counterclaim ¶ 29). In sum, defendant has alleged facts stating a claim for promissory estoppel under New Jersey law.

Plaintiff argues, nonetheless, that defendant has not alleged any clear and definite promise, because the court must take into account "the context of ongoing negotiations regarding the distribution of the Product outside of the United States and the draft Distribution Agreement." (Pl's Mem. (DE 22) at 25). Plaintiff cites to its own allegations in response to the counterclaim that the parties exchanged eight versions of a draft distribution agreement, and that some drafts gave plaintiff the option to cancel if an EUA was not issued. (Id. (citing Preliminary Statement (DE 17) ¶¶ 10, 19, 22, 28, 29, 32, 43-46)). The court, however, need not accept as true plaintiff's factual allegations asserted in the preliminary statement of the response to the counterclaim, which are deemed denied by defendant. See Fed. R. Civ. P. 8(a)(6).[11] Rather, the court construes the facts alleged in the complaint and the counterclaim in the light most favorable to defendant. See

---

11   Plaintiff invites the court to order defendant to reply to plaintiff's preliminary statement contained in its response to the counterclaim. (See Reply (DE 30) at 8). The court, in its discretion, declines to so order, where the preliminary statement comprises fifty-five paragraphs of new factual allegations, and where the parties already are engaged in discovery with limitations on requests for admissions set forth in the court's January 21, 2021, case management order.

Drager, 741 F.3d at 474 (4th Cir. 2014). As such, the allegations enumerated in the court's analysis above are sufficient to state a claim for promissory estoppel.

Plaintiff's citation to Aircraft Inventory Corp. v. Falcon Jet Corp., 18 F. Supp. 2d 409 (D.N.J. 1998), misses the mark at this juncture, because of plaintiff's reliance upon its own disputed allegations. In Aircraft Inventory, the court granted summary judgment to a defendant in a case involving the alleged sale of an airplane. The court concluded that the evidence demonstrated no contract to sell, nor promise to sell, the airplane, where the alleged promise to sell was "conditional and contingent" upon a separate transaction. Id. at 416. Plaintiff contends the promise in this case also was contingent upon a distribution agreement and the EUA. (Pl's Mem. (DE 22) at 27). But, defendant does not allege such contingencies in its counterclaim. Accordingly, Aircraft Inventory is inapposite.

Plaintiff also urges the court to compare the instant case to an unpublished district court case, Zhejiang Rongyao Chem. Co. v. Pfizer Inc., No. CIV.A. 11-5744 PGS, 2012 WL 4442725, at *1 (D.N.J. Sept. 21, 2012) (hereinafter, "Rongyao"). Rongyao, however, is distinguishable in several key respects. As an initial matter, the court there held that the plaintiff manufacturer had stated a claim for breach of contract against a pharmaceutical company distributor, falling under the "specially manufactured" goods to the statute of frauds. Id. * 5. In particular, the court found a viable breach of contract claim, where the plaintiff alleged it manufactured a product exclusively for the defendant (which defendant had an exclusive right to sell) "pursuant to a long term supply contract" with a "five-year period." Id. * 4. By contrast, the court dismissed plaintiff's promissory estoppel claim premised upon the allegation that the defendant "indicated . . . that it was seeking a long term commitment . . . to produce [the product] for many years into the future." Id. *6.

Here, defendant is not relying upon a mere allegation that defendant indicated it was seeking a long term commitment for an indefinite future term. Further, unlike in Rongyao, there is not a supply contract already governing production of the product at issue. Rather, defendant alleges a promise to purchase made for a specific amount in a specific time period.

Plaintiff argues that this case is analogous to Rongyao, where the court noted that the complaint was devoid of "specific allegations regarding who communicated the alleged promise . . . when and where it was made, or what the specific parameters of the promise were." Id. at *6. There, however, the plaintiff asserted a promise made "in 2003 or 2004," at least seven years prior to the formation of the supply contract in 2011 which formed the basis of the breach of contract claim. Id. That is not comparable to the instant case, where the alleged promise was made in a short time frame in late May 2020 for production and purchases to begin almost immediately thereafter. In sum, Rongyao is inapposite.

Plaintiff also argues that "the potential for purchase of the Product to be distributed outside the United States was tethered to potential purchases for distribution within the United States," citing paragraphs 13, 19, 26, and 27 of the counterclaim. (Pl's Mem. (DE 22) at 28; see Reply (DE 30 at 7). These paragraphs of the counterclaim, however, do not so state. Rather, viewed in the light most favorable to defendant, these paragraphs state that plaintiff requested the Product for distribution outside the United States, in addition to the Product for distribution in the United States. Indeed, paragraph 19 states that "[i]n addition to the quantities to be shipped to the United States, [plaintiff] again requested that [defendant] procure 1,000,000 . . . second generation units of the Product for [plaintiff] to distribute outside the United States in June." (Counterclaim ¶ 19) (emphasis added). Contrary to plaintiff's assertion, defendant does not allege "tethering" of purchases outside the United States to those within the United States.

19

In sum, defendant has stated a claim for promissory estoppel under New Jersey law based upon its allegations. The court leaves for another day determination of the viability of the claim based upon a more complete record. Therefore, in this part, plaintiff's motion for judgment on the pleadings is denied.

## CONCLUSION

Based on the foregoing, plaintiff's motion for judgment on the pleadings is GRANTED IN PART AND DENIED IN PART. Defendant's counterclaim for breach of contract is DISMISSED WITHOUT PREJUDICE. Defendant's counterclaim for promissory estoppel is allowed to proceed. In addition, defendant is allowed an extension of time to 21 days from the date of this order to file a motion for leave to amend the counterclaim.

SO ORDERED, this the 15th day of June, 2021.

_____
LOUISE W. FLANAGAN
United States District Judge